22-3218 Clyde Carter, Jr. v. Secretary, Department of Labor Then his FILA lawsuit is proceeding and they're taking depositions. They send in interrogatories and then one of Mr. Carter's supervisors, Thompson, he visits with the FILA attorneys and we don't really know exactly how this all came about. But he did testify at the on-site investigation hearing that he was the corporate representative in the FILA case and so that's why he was meeting with the FILA lawyers and he got all the discovery material. Oh, and I should say, Judge Chapman at the very first hearing, she found that the jury verdict in the FILA case, which Mr. Carter thankfully got a favorable jury verdict, that the corporate representative wasn't Mr. Thompson. It was somebody else. So that question is still out there. Why was he meeting with the FILA attorneys? Why did he get all this discovery material? But he testified at the on-site investigation that he took the material back and then he and another man, Sheryl, another supervisor, and Sheryl is below Thompson. They went over the FILA paperwork, discovery, and almost immediately commenced this investigation hearing which led to Mr. Carter's dismissal. He was dismissed for being dishonest, was the allegation. It was alleged that this FILA investigation came up with Mr. Carter's employment application. And it's in the record. The employment application is not the original application. They never produced the original application. This application is a redacted copy of the original application. The allegations of dishonesty concerned prior injuries that Mr. Carter didn't report, they allege. And he said that he did report them because there was an employment interview that he had to attend in Topeka, Kansas after they accepted his initial application. So he goes to Topeka, Kansas. He's examined by their positions. He speaks with their positions. They make notes. He talks to the human resources officers. They make notes. And then down the line he is ultimately offered a job. Now they claim that he lied on his application, but the application that they use doesn't have anything from the Topeka interview and examination. In other words, they said that he lied about having his knee operated on. Well, we never really figured out with any clarity if it was an operation or just a procedure. And Carter says that he showed it to the doctors when he went to Topeka and asked them about it. And they said, don't worry about it. That wasn't a surgery. On the application that they produced, it said, have you ever had a surgery? Well, he told them about how he'd had a kidney transplant. That's pretty serious surgery. But he didn't tell them about the knee because the doctors said that that wasn't a surgery. What would be the difference? I mean, you could have a knee replacement, which obviously everyone would understand would be a major surgery. Or you could have an orthoscopic procedure that's done externally without complete sedation. But it's still considered, I think, a surgical procedure. It's not going to give you pills. Well, as we understood it, this was some kind of a scope, a minor intrusion, where they were trying to diagnose what was going on with his knee. So nothing was, like, ground or reconnected. And even the people who testified at the trial before Judge Chapman didn't know if it was a procedure or if it was surgery. It was just one of those gray areas. It didn't make any sense that he would lie about that. I mean, he showed them the hole, the scar that was in his knee. So also there's some issues about when he was a kid, he was ‑‑ Your time's moving rapidly. Would you focus in on the absence or your position as to the absence of substantial evidence for the administrative result here? Because I think that's what's really important. Yeah, and that kind of was what I was doing. We're not rehashing the facts. What I was trying to say was that wasn't established. All that business about him lying about his physical injuries wasn't established to justify him being terminated. There had to be something different about it. There had to be something more to it. And we claim that it was because he filed a notification that he'd been injured on the job. Now, he got a favorable decision at his first hearing, and it was appealed. The Administrative Review Board agreed that it was a proper decision, but when it came up here, the judge unfortunately had used a flawed chain of events analysis. And so this court set aside that favorable decision. Counsel, I wanted to ask you a legal question. So what is the protected activity that you're asserting here? Is it just the reporting of the on-the-job injury, or is it the filing of the FELA action? It's the notification of injury. And if you use the term report, that sounds like a one-time, and that is not in the law. That just sounds like a one-time thing. The law specifically states notification. So can the filing of a FELA action be protected activity? I think it can be. And we tried to amend, we sought to amend when it was remanded to add, because with his complaint that he had filed his FELA, and that had informed people even more so. So how have you been allowed to make that amendment? How would that change the analysis? Well, in a couple of ways. One, I'm trying to remember what it was. I can't remember now. Sorry. If it pops into my head, I'll jump back. Oh, there was no dispute about it. There was no dispute that they had interfered with his right to treatment. And it justified, and they agreed with that. But it also, it supported that he was treated wrongfully because of being injured on the job. And this court sent, remanded with four things, or five things for the Department of Labor to do. And we went back down to the Office of Administrative Law Judges. They found some odd things. One, we agreed that the findings of Judge Chapman about Carter's truthfulness would remain in place. And then the Administrative Law Judge, Leslie, she found that Carter had been terminated not by a man named Cheryl, who was kind of the judge at these on-site hearing offices, but that he was terminated by a man by the name of Neenan. Neenan was somebody who allegedly lived in a bubble in Houston who reviews cases and determines if people should be disciplined. And he didn't know anything about the Fela case. So there was no way that he could use that against Mr. Carter. Unfortunately, Neenan didn't terminate Carter. Cheryl did, and Cheryl knew of Carter's Fela injury and his notification of injury. Also, but she went ahead and found that Carter was dishonest, premised on this flawed application business. She also found Carter was dismissed twice. They wanted to make sure that they really got him dismissed. So he was dismissed again for some clocking in issues. She found that Carter was correct and honest about that, but everybody was just confused. And so that was just a mistake. Our point is there's not substantial evidence to that effect, because Carter's allegation was that they used his clocking in to terminate him because it was on-the-job injury. Mr. Boney, you're well within your rebuttal time. You can continue if you like, or you can reserve it. Okay. I just want to make one last statement, and that is that at the administrative law level, where we're appealing from, that judge rewrote the opinion of Chapman. And if you look at it, it's on like page 15 of her opinion. And if you go to Judge Chapman's opinion about the same business, it's completely different. And it wasn't a mistake. It had to be done purposefully to show that Carter was dishonest. Thank you, Mr. Boney. Thank you. Department of Labor, Mr. Morales. May it please the Court, good morning. My name is James Morales. I represent the Secretary of Labor. This Court should affirm the decision of the Secretary on remand from this Court that BNSF did not violate FRISA in discharging Carter because substantial evidence supports the ALJ's conclusion on remand that his protected activity played no role in his discharge for multiple instances of dishonesty. Substantial evidence is enough as evidence that a reasonable mind would find adequate to support the ALJ's decision. And here, such evidence includes a considerable gap in time of more than four years between Carter's protected injury report in 2007 and his discharge in 2012 for dishonesty on his job application and regarding his attendance on February 5, 2012. Counsel, let me ask you about that time gap. Because if the filing of the FELA action is protected activity, then the gap is not four years. It's less. That is correct, Your Honor. However, under the ARB's own precedent, which was acknowledged by this Court in its 2017 decision, in order for a FELA lawsuit to be protected activity, it needs to provide more specific notification of the injury. So the FELA lawsuit in itself is not a protected activity under FRISA? I believe OSHA considers it to be protected activity. The Administrative Review Board, which issued the decision here, and I suppose I'm sort of representing the Board, does not consider a FELA lawsuit in itself to be protected activity. It needs to provide more specific notification of the injury. I think that decision didn't foreclose the filing from being protected activity. It said in that particular case it provided additional information. I'm not sure the holding was that broad. In other words, I don't think it forecloses it. I guess I would go back to the Administrative Review Board's decision here. It concluded, sort of reading its own past precedent, this Le Dure decision from 2015, that in order for Carter's FELA lawsuit here to be protected activity, it needed to provide more specific notification of his injury. And the ARB affirmed the ALJ's conclusion that it did not do that here because Carter's supervisor, Thompson, was aware of the injury when it occurred. And the ALJ found, based on the testimony of BNSF officials, that all BNSF learned through the FELA lawsuit was that Carter had omitted previous service with the Navy and previous work-related injuries from his application. Providing additional information about damages, pain and suffering, doesn't that also change the situation here in terms of whether it's protected activity? And was that provided here? If Carter's FELA lawsuit had provided additional information regarding the nature and the extent of his injury, then it could constitute more specific notification to qualify as protected activity. But here, the ALJ concluded that it did not. And this was based on the testimony of BNSF officials. And in particular, they knew about the injury when it happened. And I think Carter has failed to establish that that conclusion isn't supported by substantial evidence. He hasn't pointed to anything in his FELA lawsuit or subsequent depositions that BNSF learned that they didn't already know, either through the injury or through the course of his employment, during which he was on leave for a couple stints of time for a surgery. He had lifting restrictions as a result of his injury. And BNSF was aware of all that because it was in the course of his employment they learned about these things. So I guess I would just say that, yes, it is possible for a FELA lawsuit to constitute protected activity if it provides more specific notification. But here, the substantial evidence supports the conclusion that this FELA lawsuit did not provide more specific notification. What's the timeline in this case? What's the significance of August 30, 2007? That is when Carter made his injury report to BNSF. That's when he injured himself on the job. And what happened thereafter? And when did he lose his job? So this is an excellent question. So he lost his job over four years later. And he lost his job because BNSF discovered that he omitted some prior work-related injuries and his Navy service from his application. And then also they concluded that he was dishonest regarding his attendance on February 5, 2012. And the ALJ here concluded basically that there was no relationship between the injury report, which happened so long ago, and then the reasons why he was suspended. How was he injured? What caused his injury? I think counsel for Carter spoke to that before. But I think there's no dispute that the injury report in 2007 was protected activity. Because he, let's see, the nature of his employment was doing what? He was employed as a car man. So did he lift things? Did he repair his car journals? I believe it was a physically demanding job. And there's no dispute that he injured himself in the course of his employment and that the report of that injury was protected activity. Counsel, help me with the disposition here. As I understand, there was an initial ALJ evaluation of this that favored the claimant. It goes through an appellate process. It's remanded. And the same record, not a new hearing, but the same record is used by a second ALJ that comes out the other way. And did that process include a re-examination or re-determination of the factual record? Yes, that's correct, Your Honor. So in this court's decision in 2017, the court concluded that the ALJ in the initial case failed to make sufficient factual findings to support contributing factor causation, which is the standard here. That's the burden that Carter needed to show. Or the rejection of BNSF's affirmative defense. So it's sent back to the ALJ. And here, based on the same record, because there was no additional testimony, the ALJ made additional findings. And in particular, the ALJ made additional credibility determinations, finding that the BNSF official As I understand the appellate's position, the ALJ kind of re-found facts. But you're saying the second ALJ simply found facts that hadn't been determined previously? That's correct. So the ALJ on remand explicitly adopted the original ALJ's credibility determinations, which were limited to a finding that Carter was credible regarding the application process. However, this court noted in its decision that there were no further credibility determinations regarding, for instance, BNSF's motivations for the discharge here. that Carter was dishonest and discharged him on that basis, and that his productive activity played no role in the decision to discharge him. And because this decision is supported by substantial evidence, we respectfully request that this court affirm the decision here. And if the court has no further questions, I'll allow the intervener to speak. I see none. Thank you, Mr. Moorlach. Thank you. Mr. Morrell for BNSF. Good morning, Your Honors. May it please the court, my name is David Morrell on behalf of BNSF Railway Company. Just to be clear, the ARB ruled in favor of BNSF on two independent grounds, either of which would be sufficient to affirm the ARB's decision and to dismiss the petition for review. The first ground was, of course, the absence of any contributing factor, that the productive activity didn't play any role in the company's decision to terminate Mr. Carter. And second, the ARB alternatively held that even if it had played a role, that BNSF carried its affirmative defense to show that it would have dismissed him, even without that protected activity, given the two forms of dishonesty that Mr. Carter engaged in, specifically relating to his employment application and the other relating to the clock-in issue in February of 2012. But one issue I just wanted to make very clear is the court's not coming to this case and riding on a blank slate. As the court knows, there was a prior panel that reviewed the prior agency's decision and found a series of deficiencies both in the reasoning and the absence of fact-finding in the agency's prior decision. And it basically put out a laundry list of issues that on remand the agency needed to address. And on remand, the agency, the ALJ found, and the ARB affirmed, all of the issues that this court had charged it with deciding. And so I'll just walk through those briefly. The first one is the panel had noted that the agency failed to really account for the temporal gap between the protected activity in 2007 and the ultimate dismissal in 2012. And to address Judge Grass's questions about the role of the fetal litigation. So first of all, the court not need to wade into that because there's a factual finding at page 14 of the appendix where the ARB specifically affirmed the finding that neither the injury report in 2007 or the fetal litigation played any part in BNSF's dismissal decision. And so the court need not get into parsing whether this was some new form of protected activity because regardless, it didn't play any role. So the court can affirm on that basis. But even if you did look at whether the fetal litigation was a new form of protected activity, the prior panel and Carter One specifically addressed this and said, it's not per se a form of protected activity. It only becomes a form of protected activity if it provides further notification of the injury. And Brian Thompson is a very important individual in this regard. He was the individual who was present. He was a supervisor at BNSF. He was present on the day of Mr. Carter's injury. So he was well aware of the injury. And he's the one who reviewed the deposition transcripts in 2012 and was the one who essentially began inquiring whether there had been discrepancies in the employment application. And so what the ARB found is that nothing in the fetal litigation would have given him any further notification, and thus there wouldn't have been any new form of protected activity. But again, the court doesn't need to get into that just because it didn't play any role regardless. A second issue that the court had left open or identified as a deficiency was the absence of credibility determinations regarding whether BNSF had targeted Mr. Carter. So Mr. Carter relied in this regard on his own testimony and the testimony of Larry Mills. And the ALJ on remand found that they were not credible with respect to the claim that BNSF was targeting them. And the ARB affirmed that as supported by substantial evidence. The third issue that this court identified is whether BNSF sincerely believed that Mr. Carter had engaged in misconduct and had dismissed him on this basis. And again, the ALJ found and the ARB affirmed, crediting testimony to the effect that BNSF did sincerely believe that Mr. Carter had engaged in both forms of dishonesty and the ARB again affirmed on that basis. And finally, this court had identified the role of the fetal litigation and what role, if any, it played in his dismissal. And again, on remand, the agency found that it didn't play any role at all. And so given the failure of Mr. Carter to prevail in the prior round of litigation, at least before this court, which found the agency decision insufficient, now that the agency has essentially addressed all of this court's prior issues, there's even more basis to affirm the agency's decision. And finally, I'll just note that where I began on page 14 of the appendix, there's a key finding by the ARB affirming the ALJ that, again, neither the protected activity in the form of the injury report in 2007 or the fetal litigation itself played any part in BNSF's decision to dismiss Mr. Carter. And so there's substantial evidence supporting that. The ALJ credited testimony from several witnesses, including Mr. Heenan, Mr. McNall, Mr. Sherrill, Mr. Thomas, all of whom testified to the effect that BNSF was sincere, was not motivated or reacting to Mr. Carter's protected activity. And all of that was subject to a credibility determination. The ALJ credited that testimony and relied on that to reach the ultimate question about whether the protected activity played any role in the dismissal. And so for these reasons, we'd respectfully ask the court to affirm the finding that Mr. Carter failed to prove contributing factor. And even if the court wants to look past that particular issue, it can also affirm on the affirmative defense. Unless this court has any questions, I'll yield the balance of my time. Thank you, Mr. Morel. I don't see any questions. Mr. Boney, your rebuttal. Thank you, sir. Yeah, we submitted this exhibit, CX11. It's the deposition that was taken in 2012 that Thompson and Sheenan looked over in unison, and that's when Judge Chapman at the first hearing said that's when animus came into play, came into existence. It was these two men came together, went over this material, and then decided they were going to have this investigation hearing and terminate Carter. Now the subsequent... What exhibit number is that? Beg your pardon? What's the exhibit number on that? CX-11. Now on remand, the administrative law judge found that Carter was credible. And then when it went to the administrative review board, that judge used her own determinations of credibility. In other words, didn't find that the one judge below her, her determinations were based on substantial evidence and just replaced them all. Thank you, Mr. Boney. Thank you also, counsel, for government agencies and BNSF. We appreciate participation by all counsel in the arguments before the court this morning. We will take the case under advisement. Counsel may be excused.